Mr. Feeberger, are you with us? I am. And Mr. Schillingstad? I am. 20-2017 from the District of Minnesota, Michael Vinh v. Express Scripts Services Co. Mr. Feeberger, you may proceed. Thank you, Your Honor. I am. I'm on my phone. The webcam did not work, apparently. So, I believe you can hear me. Is that true? I can both see and hear you. Perfect. That was the idea. Thank you. Your Honor, I am Rolf Feeberger. I'm here for Appellant Michael Vinh, and may it please the find genuine issues of material fact on my client, Mike Vinh's, reasonable accommodation and discriminatory discharge claims. And we're asking this court to reverse and remand his case for trial. The facts in the record show Vinh was not provided reasonable accommodation for his known disability by his employer, Express Scripts. And instead of being given the opportunity and law, he was terminated. So, when Vinh returned from a five-month medical leave for a severe chronic disability in his neck called cervical dystonia, his doctor restricted his workday to six hours and prescribed that he stand for half of that time as it was sitting that was most to provide him a standing desk so that he could do his work more comfortably and within his restrictions. Despite having the agreement of his supervisor and having documented evidence of requesting one from Express Scripts third-party benefits administrator, A.I. Hewitt, Vinh was never provided a standing desk. Now, the law does not require an employer to provide the exact accommodation requested if another accommodation would be sufficient, but it does require an employer provide some reasonable accommodation if one is available. And in fact, Vinh was never provided an accommodation for having to stand for half of his workday while actually being able to get work done. And let me be clear, this is a standing desk for a home, standing desk the office, or two of them? Absolutely, your honor. So, his request was for a standing desk just on its own. And the record is pretty clear that it was a request for at work. What we do have, though, is, you know, Vinh was permitted to work from home, which is what I'm, what I presume your question is getting at. That was the follow-up. Go ahead. Absolutely. So, what we know is that he testified at his deposition that sitting was a challenge for him. So, what he would do is he would stay at home to try and be most comfortable. So, when, and this also kind of gets into the essential functions, but when he talked about in his declaration that because whenever he would be at the office, he had to stand up and walk around when he was sitting at his desk. If he had been able to stand at his desk, he would have been able to be more comfortable. But then, what, he probably would have done more work at work if he had had the standing desk and the ability to have, to stand up when he was doing his work. He did say, and this kind of leads into one of the essential functions that Express Scripts is providing. He said in his declaration that he would go into the office when he had important phone calls. And this is exactly what Express Scripts contends they terminated him for, because he didn't do well on these communications. Well, Vinh is at home most of the time when he's trying to get his work done and stay comfortable while he's still dealing with this cervical dystonia that has just kept him out of work for five months. And he's now on work restrictions to try and deal with this severe neck impingement. Now, when he goes into the office, he's still got to sit down. And the sitting is what his doctor is trying to restrict him from. He said, you can sit up to three hours out of your workday. For the other three hours, you need to be able to stand. And being able to stand was not provided to him by Express Scripts. So that's, I think, what the standing desk would have really been helpful with. So instead of actually providing Vinh with the tools he needed to be successful, the standing desk, when Vinh came back from his five-month leave, he was put directly onto a performance improvement plan that did not take any of these restrictions into account. And instead of helping him improve his performance, his supervisors instead worked to terminate him as soon as his restrictions were removed. They emailed on the day that his work restrictions were taken off to say, how can we terminate him now? So one of the other things that is necessary with the functions is that they need to be clear in terms of being able to find and grant summary judgment. Now, Vinh's essential functions, as we pointed out in our briefing, were far from clear. The essential functions weren't known to Vinh or his boss. Vinh's supervisor had never seen his job description. And this is consistent with her management. During the time that Vinh worked for her, she hadn't seen Vinh's return to work form or his work restrictions either. Vinh also testified he hadn't seen his job description before. When he saw it at his deposition, he said he didn't perform any of those essential functions that were listed. And his supervisor agreed. Huber's testimony was that the first four essential functions listed on the job description were not things that he was doing. And while Vinh was working for Express Scripts, he was moved to all sorts of different places in the organization, to different teams, and worked on all sorts of different projects throughout his time as a senior project manager. So the essential functions of his role or exactly what he was doing from team to team would change depending on who it was he was working with. Wouldn't it be rather obvious, though, that a senior project manager has to be able to effectively communicate? Sure. And communication. I think communication is something that most people should be able to do. But communication, I don't think, Your Honor, is the same as someone having, say, a 10-pound lifting restriction as in a job where you need to be able to lift 20 pounds. Communication isn't objectively measurable. It's at best a malleable function. It's not clear enough to provide for a grant of summary judgment. I think the communication issue is, I think it's a fact issue. I think it is something that could be submitted to the jury, and the jury could believe Express Scripts. In terms of summary judgment where it needs to be as a matter of law, I don't think this communication evidence is sufficient to withhold summary judgment. I think it's a question for the jury. Let me ask you a different question. The other side makes very, very much of the fact that Vin's doctor testified that Express Scripts complied with almost all of any restrictions that he could think of. Is that true? Your Honor, yes, he did testify that. That is true. At the same time, Your Honor, Dr. Sperl is not an expert on reasonable accommodations. He's not somebody who we had put up as an expert. He was Vin's treating doctor, and what the reasonable accommodations were, and whether Express Scripts had provided a reasonable accommodation, I think is a legal question. Now, what they didn't do, and what the record reflects, is they didn't provide anything for Vin to be able to stand during the time that he was working at Express Scripts. He was supposed to stand for three hours out of the day. There was no, there was agreement from his supervisor to provide him a standing desk, and they didn't provide him with that standing desk. There wasn't any other accommodation for that three hours, the limit of three hours sitting. So, once he went over those limits, he was outside of those work restrictions. So, he needed to stand for half of his work day, and he was not able to do that. So, you know, and Dr. Sperl also testified that a standing desk was going to help him a lot. He also testified that he asked Vin to ask his supervisor for a standing desk. So, you know, even if Dr. Sperl's testimony is potentially dispositive, there's at least a fact issue as to his testimony. So, that's the reasonable accommodation claim. I would like to talk a little bit about the discriminatory discharge claim and the main issue of evidence of replacement by a non-disabled individual. So, the Minnesota Supreme Court has not addressed that specific issue, and the prima facie standard as applied in Hoover is not binding on this court. Well, I've got to interrupt you again. Boy, there are quotations like from the Hoover case. It looks like that's the law of Minnesota, replaced by a non-member of the protected class. And you know the other cases. I don't have to tell you what that is. Absolutely, Your Honor. So, what happened in Hoover is that the replacement by a non-member of the protected class was undisputed. In Hoover, a non-disabled person replaced the plaintiff who had fibromyalgia. The same with the Supreme Court case that they cited, Fedgies, where a 56-year-old in an age discrimination case was replaced by a 27-year-old. The other cases are not binding. They're Minnesota Court of Appeals. They're unreported, and there's another Eighth Circuit case where the standard is just stated but decided as a preemption case. It's a different legal issue. What the Minnesota Supreme Court has done is adopted the McDonnell-Douglas burden-shifting analysis. So, the McDonnell-Douglas standard is a flexible standard, and the standard is applied to each prima facie case driven by the facts of the case. The plaintiff still has to satisfy the elements of a prima facie case, but it's not a rigid application. And the Supreme Court has never looked at a discriminatory discharge case and said that the plaintiff does not get their day in court because they were not replaced by an individual who is not a member of the protected class. So, it's not settled law. And I'm running into... I'm going to finish answering your question here real quick. This court has previously applied McDonnell-Douglas to a case with these exact same allegations. In Kamuller, which is from 2004, three years after Hoover, plaintiff filed claims for failure to accommodate his disability and the same allegations as here. When the court was discussing the discriminatory discharge claim, this court cited Hoover for the application of the McDonnell-Douglas burden-shifting framework. And the court described evidence in the record that the discharge was pretextual and reverse summary judgment. Nowhere in that opinion is being replaced by a non-member of the protected class mentioned. So, the same application would be appropriate here. And unless you have additional questions, I am into my rebuttal time. So, I would like to sit down. Very well. Thank you, Mr. Feberger. Court will hear from Mr. Schillingstad. Thank you, Your Honor. May it please the court, counsel, my name is Hal Schillingstad. I'm one of the attorneys for Express Scripts, the appellee in this case. My client asks that the district court judgment be affirmed in all respects. Because first, as to the discriminatory discharge claim, based on a disability, that claim fails because Mr. Vinn failed to satisfy his prima facie case by showing a non-disabled person filled his position after his discharge. And even if we set the prima facie case aside, the district court did the analysis as well to confirm that his claim fails because there's no genuine issue of material fact that his discharge was pretextual and that in fact his discharge was for a legitimate non-discriminatory reason. Appellant's failure to accommodate claim likewise fails because there are no genuine issues of material fact that Express Scripts provided Mr. Vinn with a reasonable accommodation consistent with his treating doctor's orders and that even with that accommodation which Express Scripts complied with, Mr. Vinn could not perform the essential functions of his position and was terminated for his failure to do so after being put on a personal improvement plan. For these reasons, we ask that the court affirm the district court's judgment in all respects. In my time, I thought I would focus my remarks on what seems to be the bulk of plaintiff's briefing, namely whether there is a fact issue that Mr. Vinn's termination was pretextual as to the discrimination claim and whether Mr. Vinn could perform the essential functions of his position with or without accommodation and whether my client provided him with that reasonable accommodation. The factual underpinning... Before you go there, Mr. Shellingstead, on the prima facie case question, it appears to me that there is Minnesota case law that supports your position that he had to have been replaced by a non-disabled person to make his prima facie case, yet I think there's a circuit case law that comes after that that doesn't include that as one of the elements of the prima facie case. What are we to do with that? Well, as to that, I would rely on the Hoover case, which is the Supreme Court case decision that has been cited repeatedly by the Minnesota courts that have considered that issue. But I would say I agree with the court that the cases seem to be all over the place on this. I mean, I can see the standard that Mr. That appellant puts forth, particularly in that Kammuler case, they cite that standard in their reply brief. But if you look at that Kammuler citation with respect to the standard that they applied in that case, it really took the failure to accommodate case, which is a more flexible standard, as the court knows, because with respect to the failure to accommodate case, and cited by Kammuler, which is the one that the plaintiff cites on, it goes through that same McDonnell Douglas standard, but uses that more flexible standard, which is it's a modified burden shifting analysis, which is that person was disabled, qualified to perform essential functions. Now, that's key in the Kammuler case that cited that. In Kammuler, it used that second element of essential functions, which we know from Judge Nelson's analysis, that isn't the standard that applies with respect to discriminatory discharge. And then the third element in the Kammuler case was suffering adverse employment action because of his disability, which is that broad, flexible standard that appellants put forth here. I would refer to the court to, in looking at all these cases, I thought Judge Montgomery had the clearest statement of why that third element as stated in Hoover is important. And it's because of this. In this case, as Judge Nelson points out, paragraph 12 of plaintiff's complaint is that Mr. Vinn was terminated because of his disability. This is a disparate treatment claim specifically, and that the act of termination was because of his disability. Judge Montgomery in the Bolt case was wrestling with both the direct evidence or circumstantial evidence rules, and said in a disparate treatment claim like this one, the plaintiff in that case must prove that the defendant acted with discriminatory intent. That is, that its actions were actually motivated by a protected trait. And here, then the court goes on, acknowledges there is no direct evidence, as Judge Nelson did here, and that that discriminatory intent, it has to be proven, and he must prove it circumstantially through the McDonnell-Douglas burden-shifting framework. We cited to the case the Court of Appeals decisions, the District Court decisions, and I think the other federal court decisions that we cited as well, all hold that replacement by a non-disabled person is a critical element. I have not seen that overruled. I have not seen the issue that plaintiffs are raising here discussed, but I will say that in the other cases, there was some evidence of direct evidence. For instance, in Kammuler specifically, there was a policy that was in place that prevented the plaintiff from performing his job. So there, there's a direct evidence along with circumstantial evidence. So there's a mixture of evidence. This case has zero direct evidence. The termination decision, according to plaintiff, was solely driven by his status as a disabled person. So for that reason, we think that in that, in that type of case, the third element, as stated in Hoover and all of the other cases that we cited to the court, is why that element is necessary in this type of case, because you have to prove that that was the actually, that the termination was actually motivated by the protected trait. Are you saying there could be other evidence, like they have two identical employees, business has gone down in half, employer decides to fire one of them and says, let's fire the disabled person because they might not make it to, you know, for many more years. So you say in that case, you wouldn't have to show replacement by a non-member of the class? Well, I think you would in the absence of any other evidence. No, no, wait, wait. There's no direct evidence. Excuse me. Well, I said two employees are exactly alike, except for, except for one of them being disabled. They got to fire one and they're not going to replace, they're not going to get an employee they don't need. So in that case, you wouldn't need it, right? Surely. Well, under the Minnesota Human Rights Act and Hoover, you would have to prove that if you say that that termination was driven by the protective trait only of disability, you would have to prove that that person was replaced by a non-disabled person in the protected classification. I mean, I, I understand what you're saying. I understand you're just not going to answer the question. That's okay. But yeah, I think, maybe I don't understand the question. I'm sorry. Here and why you can't distinguish some of them. Well, I can distinguish them because in all the other cases there, there's, there's direct evidence of policies and procedures that are direct evidence of discrimination. In this case, there is no policy disparate. In this case, it's only disparate treatment as to the protected trait, not because of the impact of a policy where that other type of evidence would come in where the more flexible standard can be used. Okay. Proceed. So in this case, even if we set the prima facie case aside and we think we prevail based on that judge Nelson's order should be affirmed on that basis, we look at Mr. Vinn's performance. So why was he terminated? Was it because of his disability? Was it because of some discriminatory animus, even if we use the flexible standard that the, that the appellant suggests here? We'd submit to the court, no, because what do we know about Mr. Vinn's performance? We know that in 2015, Mr. Vinn was the lowest rated employee based on his performance prior to his disability and prior to his diagnosis of cervical dystonia. That performance was confirmed by the weekly meetings that his supervisor had with him in 2015 documenting his performance issues. To say that Mr. Vinn didn't know what his job was or what the essential functions were, I would submit to the court that when you are directly reviewed by your supervisor telling you what you're not doing well on your job, both in one-on-one meetings and with respect to the actual formal review process, that is as good of evidence as any of what the essential functions of your job are. So with respect to Mr. Vinn, before he went on disability leave in September of 2015, we know from Mr. Vinn's own testimony that he didn't think that any of the actions taken against him in 2015 up to the time he went on leave in September of 2015 were discriminatory in any way or that there was any pretext with respect to his review finding of the threshold holding and the lowest rated employee and that there was no pretext with respect to the employer's conduct prior to 15. So as far as the curtain can close on 2015 with no discrimination and no pretext with respect to Mr. Vinn, we then get to 2016 and that's where we get to the return to work with Dr. Spurl. Now ultimately plaintiff's case falls apart and crumbles as you can see from the district court's order based on Mr. Vinn's testimony and also his treating doctor's testimony. So in January 31 of 2016, a return to work form is completed by Dr. Spurl, who is Mr. Vinn's treating doctor, who outlines various accommodations that are necessary for Mr. Vinn's return to work. Mr. Vinn, that return to work form is complete on January 31. Mr. Vinn returns to work sometime in mid-February of 2016. When Mr. Vinn returns to work, he meets with a supervisor, Ashley Huber, who reviews with him the accommodations that were requested with respect to sitting, standing, all of those, I'll say the one through nine, as we all know, they're all numbered on the return to work form. And Ms. Huber and Mr. Vinn agreed that Mr. Vinn could take as many breaks as he wants, could stand up when he wants, if he was sitting too long or the visual stimulation was too much, he could take a break. And so we know from the testimony in this case that Mr. Vinn proceeded with that process and Ms. Huber and Mr. Vinn both agreed to that discussion to go forward under those circumstances. Nowhere in the record from the day Mr. Vinn returned to work until his termination in May of 2016, are there any complaints about the accommodations or the employer failing to accommodate any of the accommodations that were discussed, agreed to, and in particular with respect to the standing desk, which I know is a big issue for the appellant here. With respect to the standing desk, there's reference in the record only in the Aon Hewitt claim notes prior to the return to work form being submitted. I would submit to the court that the return to work form is the operative document here with respect to the medical documentation and that form does not make any mention about the standing desk. But with respect to the standing desk, Mr. Vinn's request to his supervisor and the argument from appellant's counsel about asking for it repeatedly and that company agreed to it, the company has no ‑‑ there's no testimony from a company representative that that discussion ever took place. That is 100% self‑serving testimony from Mr. Vinn post‑termination. As to the standing desk, Dr. Sperl testified that he was not sure whether a standing desk would have been helpful to Vinn's condition and explained that he never listed a standing desk as a restriction for Vinn's work because the change in position over the course of the day, which was addressed by the other return to work restrictions and the company's instruction to get up and move around as much as he wanted, that was covered with respect to the lack of a need for a standing desk. Of course, the doctor did testify that Express Script could have worked with Vinn more to reconfigure, I believe is his word, the screen time. Sure. So when we talk about accommodations ‑‑ well, let me go back. First of all, under Minnesota law, there's no obligation to participate in an interactive process under the McBee case. But to address your specific question, could have worked with him more? I don't know exactly what that means. We worked with him. We agreed with him that he could get up from sitting, stand, do whatever he wants. Most of his work was at home. We never heard any complaints. You would think that if we had to work more with him, if we would have got a complaint about some accommodation that was not provided, that would be the opportunity to work more. The employer just can't on its own divine what more would be. Gee whiz, we should do more to accommodate him to reduce his screen time. Dr. Sperl, of course, did testify to that, I'm sure in the abstract that would be a good thing. We all think more is better. Advertising at halftime on the Super Bowl. Another question I'd like for you to address, the district court was wrong, contrary to statute in Minnesota Supreme Court case, on the burden to show who's a qualified disabled person. Right? That's just wrong. Sure. Okay, great. What effect does it have on the case? Well, I don't think it has any effect on this case. I think if you look at the case law in the statute under 363.08, says that a plaintiff has to prove that he or she is disabled and is a qualified disabled person who can perform the essential functions of the job. The court did point out, I believe on pages 34 and 35 of the menu of her memorandum, that we made that showing that he was not a qualified disabled person. I think that issue is just the converse of what the plaintiff has to prove. We're presenting evidence that he's not. So in order to get summary judgment, I think we have to establish that he's not a qualified disabled person capable of performing the essential functions of his job. And I think we did that and Judge Nelson, I think, found that. So I think, I don't know if we're trying to create confusion, we're arguing over the same turf here. Do they have to prove that he's a qualified disabled person? I would say yes, who can perform the essential functions of the job. And I have to prove, the defendant has to prove that he's not. So I mean, both sides have a burden, both to sustain the claim and to sustain the defense. But the statute and the case clearly say the same thing. Thank you. Yes, sir. Go ahead. My time has expired and we would just ask that the district court's in all respects. Very well. Thank you, Mr. Shillingstead. Mr. Feeberger, you have a little rebuttal time. We're not hearing you this time, Mr. Feeberger. Just like the previous guy, I knew that would happen. Okay. What we got from Express Scripts is their version of the evidence. And what Express Scripts is asking this court to do is weigh the evidence. And that's not appropriate at summary judgment. There's evidence in the record that Vin asked for a standing desk. He asked for it from the third party administrator. He asked for it from his supervisor. And his supervisor's response is that, I don't remember those conversations. Well, that's not enough for summary judgment. That's not enough to dismiss a claim, particularly when Express Scripts, as your honor was asking counsel about on summary judgment, Express Scripts has to show what the essential functions are, that the essential functions are clear and that it was right for them or it was appropriate for them to conclude that he could not, that Vin could not perform those essential functions with a reasonable accommodation. So that was Express Scripts' burden. And on this record, with the evidence that Vin has in support of his case, that's a question that needs to go to the jury. Now, Express Scripts does have arguments and Mr. Shillingstead sure did provide those. But so does Vin. And it is not appropriate for the court to make those decisions. It needs to go to a jury. There is also evidence in the record that a jury could find was pretextual in the disability discrimination and discharge claim. Those are listed in our briefing. And they include that his supervisor did not take into consideration his restrictions in his improvement plan. And there are several other things. I see that my time is up though, your honor. So unless you have additional questions, we request the court to reverse the grant of your time. The court appreciates your appearance and arguments today in your briefing. Case is submitted and we will issue an opinion in due course.